RICHARD R. PATCH (State Bar No. 88049)
BENJAMIN C. PULLIAM (State Bar No. 294628)
COBLENTZ PATCH DUFFY & BASS LLP
One Montgomery Street, Suite 3000
San Francisco, California 94104-5500
Telephone: 415.391.4800
Facsimile: 415.989.1663
Email:      ef-rrp@cpdb.com
            ef-bcp@cpdb.com

DENNIS L. ROOSSIEN, JR. (*Pro Hac Vice* to be filed)
CLAIRE E. CARROLL (*Pro Hac Vice* to be filed)
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75201-6659
Telephone: 214.855.7500
Facsimile: 214.855.7584
Email:  droossien@munsch.com
        ccarroll@munsch.com

Attorneys for Plaintiff
Dr. Peter Attia

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| DR. PETER ATTIA,<br><br>        Plaintiff,<br><br>    v.<br><br>OURA RING, INC., and OURA HEALTH LTD.,<br><br>        Defendants. | Case No.<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Case No.

COBLENTZ PATCH DUFFY & BASS LLP
One Montgomery Street, Suite 3000, San Francisco, California 94104-5500
415.391.4800 · Fax 415.989.1663

Coblentz Patch Duffy & Bass LLP
One Montgomery Street, Suite 3000, San Francisco, California 94104-5500
415.391.4800 · Fax 415.989.1663

**PARTIES**

1.     Plaintiff Peter Attia ("Dr. Attia") is an individual residing in Travis County, Texas.

2.     Defendant Ouraring Inc. ("Oura") is a Delaware Corporation whose principal place of business is 90 Chaves Avenue, San Francisco, California, 94127.

3.     Defendant Oura Health Ltd., formerly known as "JouZen Oy" and now doing business as "Oura Health Oy" is a Finnish limited company with a principal place of business at Elektroniikkatie 10, 90590 Oulu, Finland ("Oura Oy"). Oura Oy is the parent company to Oura. Oura Oy can be served with process pursuant to the Hague Convention on Service Abroad of Judicial and Extrajudicial Documents in Civil and Commercial Matters by serving two sets of a completed Form USM-94 together with two sets of a Finnish translation of this document directly to the designated Finnish Central Authority in Finland – the Ministry of Justice, Unit for International Judicial Compliance, as follows: Ministry of Justice, Unit for International Judicial Cooperation, P.O. Box 25, FIN-00023 Government, Finland.

**JURISDICTION AND VENUE**

4.     This Court has personal jurisdiction over Oura because Oura is headquartered in San Francisco, California. Oura has general and systematic contacts with the State of California.

5.     This Court has personal jurisdiction over Oura Oy because Oura Oy extensively markets its products through Oura in the United States, including California. Oura Oy also specifically engaged in the transactions described herein with Plaintiff, and this lawsuit arises out of those transactions.

6.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1332, because the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000 exclusive of interest and costs.

7.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(b)(2), §1391(c)(2) and §1391(d) because both Defendants are subject to personal jurisdiction in this state and because a substantial part of the events or omissions giving rise to the claim occurred in this District.

**FACTS**

8.     As a part of its efforts to market its products to persons in California and the U.S.

Coblentz Patch Duffy & Bass LLP
One Montgomery Street, Suite 3000, San Francisco, California 94104-5500
415.391.4800 · Fax 415.989.1663

generally, the CEO of both Defendants, acting from the California headquarters in San Francisco, contracted with Dr. Attia to provide continuing advisory services in California and later Texas.

9.  The advisory services included specific technical advice regarding the Oura Ring's features, promotion of the product through social media outlets that Dr. Attia maintained, and promotion of the company to high profile figures.

10.  Throughout the relationship, the Defendants' CEO promised to compensate Dr. Attia.  But, when the time came, the Defendants refused to carry through on those promises.

## DR. ATTIA

11.  Dr. Attia is a renowned physician focusing on the applied science of longevity. His practice deals extensively with nutritional interventions, exercise physiology, sleep physiology, emotional and mental health, and pharmacology to increase lifespan, while simultaneously cultivating and improving a healthy quality of life.  Dr. Attia earned his M.D. from Stanford University and holds a B.Sc. in mechanical engineering and applied mathematics. Dr. Attia trained for five years at the Johns Hopkins Hospital in general surgery, where he was the recipient of several prestigious awards.

12.  Dr. Attia is the co-founder and Chief Medical Officer of Biograph. He is the co-founder and Chief Medical Officer of the fasting app Zero, created by Big Sky Health. He is an advisor to other companies such as Athletic Greens and Moonwalk Biosciences. Dr. Attia is co-chairman of the board of Frontier Acquisition Corp., and he is also on the editorial board for the journal Aging.

13.  Dr. Attia speaks frequently at hospitals and health-related businesses on longevity, metabolic-related topics, athletic performance, and his personal experience.

14.  Dr. Attia maintains an active presence on social media where he has developed a broad following numbering in the hundreds of thousands. He has relationships with prominent business leaders and other influential people.

## OURA

15.  Oura and Oura Oy are affiliate entities with Oura Oy being Oura's parent company. Upon information and belief, Defendants were founded by Petteri Lahtela, Markku Koskela, and

Case No.

Coblentz Patch Duffy & Bass LLP
One Montgomery Street, Suite 3000, San Francisco, California 94104-5500
415.391.4800 · Fax 415.989.1663

1  Karl Kivela.  The Defendants developed a product called the Oura Ring, a piece of wearable

2  technology that uses sensors to track health metrics. Defendants introduced their vision of a sleep-

3  tracking smart ring in 2015.

4       16.    Upon information and belief, the Defendants were struggling to stay afloat in early

5  2016.  In April 2016, one of the founders, Mr. Kivela, travelled to New York to raise additional

6  capital.

7       17.    By chance, Defendants' co-founder met Harpreet Singh Rai (then a portfolio

8  manager for a Wall Street hedge fund) at a Whole Foods and struck up a conversation.

9       18.    As a result of that conversation, Mr. Rai personally invested in the company and

10  became involved in Defendants' business, joining Defendants' board of directors.  Mr. Rai became

11  the President of the Defendants in early 2017 and went on to become CEO for both Defendants in

12  2018.

13       19.    Mr. Rai led both companies until December 2021. During that time, the companies

14  grew to over 350 employees, experienced strong revenue growth, and secured over $140 million in

15  funding.

16       20.    Mr. Rai was primarily based out of New York and San Francisco.

17  **Dr. Attia Serves as a Medical Advisor for Defendants**

18       21.    In December 2016, Mr. Rai (acting on behalf of Defendants) and Dr. Attia had

19  introductory discussions about Dr. Attia's potential involvement with the Oura Ring.

20       22.    Mr. Rai quickly realized the value Dr. Attia could provide Defendants.  Not only

21  did Dr. Attia have medical expertise and an interest in wearable technology, he has a well-

22  recognized podcast, and has a vast social media presence.  Moreover, Dr. Attia had been named

23  one of the 30 most influential people in public health.

24       23.    On January 1, 2017, Mr. Rai emailed the Defendants' CEO about the potential

25  relationship, highlighting his value by stating: "Dr. Attia is very well connected, not just in

26  medicine, but with all type of influencers as well."

27       24.    After using the Oura Ring and receiving some limited technical data from Mr. Rai,

28  Dr. Attia knew he could provide value to Defendants as a medical advisor. Dr. Attia could provide

Case No.

1  scientific and medical input as a practicing physician focused on the science of longevity.

2  Moreover, he could provide real-time feedback as to what people who were interested in fitness

3  and health would want from the Oura Ring.  He also understood the comparative technical

4  capabilities of competitive products such as FirstBeat, the Whoop, the Apple Watch, and Fitbit.

5  He could bring members of the scientific community and relevant researchers in the academic

6  space together to help develop, design, or analyze medical studies.

7       25.     Dr. Attia could provide awareness in the U.S. market through social media to

8  hundreds of thousands of people specifically interested in products of this nature  Dr. Attia could

9  also introduce Mr. Rai to potential high-profile U.S. influencers, partners, or investors interested

10  in wearable technology.

11       26.     Mr. Rai, on behalf of Defendants, indicated that the Defendants saw value in Dr.

12  Attia's recommendations and guidance.

13       27.     As a result of the mutual benefits of the relationship, Dr. Attia and Oura agreed Dr.

14  Attia would serve as a medical advisor for the Defendants.

15       28.     From the start, Mr. Rai, on behalf of the Defendants, agreed Oura would fairly

16  compensate Dr. Attia for his efforts and the value he added, and Mr. Rai, on behalf of Defendants,

17  promised to memorialize Oura's agreement with Dr. Attia in writing to evidence their agreement

18  that Dr. Attia would be a paid advisor for Defendants.  Dr. Attia relied upon Mr. Rai's

19  representations in providing services to Oura.

20       29.     Eager to begin obtaining Dr. Attia's guidance and formalize the relationship, Oura

21  Oy presented Dr. Attia with a nondisclosure agreement which both parties signed on February 1,

22  2017.

23       30.     Later that month, Defendants provided Dr. Attia access to their design of the

24  second-generation Oura Ring.

25       31.     On or about March 19, 2017, Mr. Rai asked Dr. Attia to beta-test software and

26  requested his feedback.

27       32.     Dr. Attia responded on or about March 21, 2017, noting he had experienced

28  glitches and errors while utilizing the Oura Ring and beta software.

COBLENTZ PATCH DUFFY & BASS LLP
One Montgomery Street, Suite 3000, San Francisco, California 94104-5500
415.391.4800 · Fax 415.989.1663

Case No.

Coblentz Patch Duffy & Bass LLP
One Montgomery Street, Suite 3000, San Francisco, California 94104-5500
415.391.4800 · Fax 415.989.1663

33.    One of the issues Dr. Attia initially raised with the Oura Ring concerned heart-rate variability.

34.    In response, Mr. Rai immediately requested Dr. Attia provide him with recommendations for doctors that could do a quick validation study for Defendants.

35.    On or about April 6, 2017, Dr. Attia emailed Mr. Rai to follow up about obtaining a written document memorializing the terms of the agreement and business relationship so that he would be compensated for his work, noting his general ideas for analytics based on sleep stage reporting, web portals, and validation.

36.    Defendants were quick to confirm that they would be moving forward with a document memorializing their relationship with Dr. Attia, and on April 21, 2017, Mr. Rai affirmed the agreement in writing.

37.    Throughout 2017, Mr. Rai on behalf of Defendants continuously promised to fairly compensate Dr. Attia for his time and work with respect to the Oura Ring. Notably, during 2017, the Defendants (a startup venture with limited capital) delayed circulating a written document memorializing the agreement, but reiterated their promises to do so and to fairly compensate Dr. Attia.

38.    At Defendants' request, Dr. Attia provided Defendants with a variety of recommendations on the product and tested the product, even catching errors in the underlying algorithm Defendants were using in the prototype of the second-generation Oura Ring.

39.    In so doing, Dr. Attia relied on Defendants' assurances that he would be fairly compensated.

40.    Given that Oura was a startup and the amount of time and effort Dr. Attia was spending as an Oura advisor and the amount of value he was adding, in late 2017 he proposed to Mr. Rai that Defendants compensate him in company stock.

41.    Mr. Rai responded on behalf of Defendants that he would check with the team but he had no issues with the proposal.

42.    By the end of 2017, the company had developed a smaller, sleeker second-generation of the Oura Ring.

43.     Throughout 2018, Mr. Rai, on behalf of Defendants, continued to solicit Dr. Attia's help in developing, testing, marketing, and promoting the Oura Ring and Defendants. In September of 2018, Dr. Attia disclosed to Mr. Rai that he had created a long list of items he thought the Defendants should do next from both a scientific and a user-interface standpoint. He also disclosed to Mr. Rai that Defendants' competitors had begun to solicit him to work as an advisor for their competing products. Mr. Rai asked Dr. Attia if he would consider making another financial investment into Defendants.

44.     Dr. Attia responded, and requested an update on documenting the agreement for Dr. Attia to receive compensation for acting as an advisor to Defendants.

45.     When he received no writing memorializing the advisory agreement, Dr. Attia raised the issue in an email to Mr. Rai at his Oura email address on October 8, 2018.

46.     Later that day, Mr. Rai, on behalf of Defendants, responded by email that he had received approval from the board to issue Dr. Attia options equal to Dr. Attia's previous total investments, as follows:

> **From:** Harpreet <harpreet@ouraring.com>
> **Sent:** Monday, October 8, 2018 1:45 PM
> **To:** Peter Attia <p@attiamedical.com>
> **Subject:** Re: September Shareholder Update & Invitation to EGM
>
> Yep - got advisory options approved by board last week. Was going to issue you options = to your total investment.
>
> Full disclosure - other's aren't getting that, some other guys likely options worth 10-20k but you have been so helpful and need your expertise more than ever.

This correspondence promised the Defendants would provide options equal to Dr. Attia's existing shareholdings, specifically "advisory options".  The Defendants promised this larger amount of advisory options because of Dr. Attia's unique expertise.  In this correspondence, Mr. Rai represented that he had Defendants' board approval of this agreement.

47.     Based on the promise to compensate Dr. Attia through stock options for working as an advisor, this representation that the agreement to compensate Dr. Attia via stock options for working as an advisor had been "approved by board last week", the acknowledgement of the value he had already added to Oura, and Mr. Rai's indication that Oura would continue to rely on his expertise as an advisor, Dr. Attia continued to perform his advisory services believing that Oura and he had reached a separate agreement that he would be compensated via advisory options to

1  purchase discounted stock in Oura.

2      48.     Consistent with the above correspondence, on January 24, 2019, Mr. Rai emailed

3  Dr. Attia a copy of an Oura Health Oy / Oura Ring Inc. Adviser Equity Plan 2018 US Stock

4  Option Agreement for Dr. Attia's consideration.

5      49.     The Stock Option Agreement stated that Dr. Attia was being awarded stock options

6  for 20,000 shares at an exercise price of EUR 1.76 per share in conjunction with his provision of

7  services in a "Medical Advisory role for Oura Ring." The Stock Option Agreement stated Dr.

8  Attia would be concurrently awarded stock options for committing to provide certain marketing

9  services including participating in medical strategy and providing a scientific and medical

10  perspective; helping make introductions to help Oura Ring be used in medical studies; committing

11  at least 10 hours a year in advisory work to the CEO, Board and other Medical Board members;

12  promoting Oura in Dr. Attia's owned and operated social channels including his newsletter and

13  podcast; and introducing Defendants and the Oura Ring to other influencers / partners and

14  potential investors. Dr. Atta's stock options would vest over a three-year period, but contained an

15  expiration date of December 31, 2023.

16      50.     Dr. Attia signed the agreement and returned it back to Defendants via Mr. Rai on

17  February 18, 2019.

18      51.     Sales of the Oura Ring dramatically increased with the introduction of the second

19  generation model due largely to the promotion of the product on social media by prominent

20  persons of influence—including Dr. Attia.

21      52.     Defendants, usually through Mr. Rai, would regularly ask Dr. Attia to provide

22  introductions to specific contacts or engage with the Oura Ring on social media. For example, Mr.

23  Rai sent Dr. Attia the following email:

24

25

26

27

28

> **From:** Harpreet <harpreet@ouraring.com>
> **Date:** Friday, August 23, 2019 at 11:50 AM
> **Subject:** quick favor
>
> can ya'll leave Chrissy Farr (great reporter at CNBC) some kind words re Oura? Really appreciate the help..
>
> https://twitter.com/chrissyfarr/status/1164967883975221249?s=12

Coblentz Patch Duffy & Bass LLP
One Montgomery Street, Suite 3000, San Francisco, California 94104-5500
415.391.4800 · Fax 415.989.1663

53.     In response, Dr. Attia tweeted the following to the requested contact on Twitter:



54.     Dr. Attia also helped recruit Matt Walker, an English scientist and academic focused specifically on the subject of sleep and its impact to human health, to Defendants' team.

55.     Dr. Attia provided significant and critical value to the growth of the Defendants' business, their senior leadership, and national and global marketing efforts of the Oura Ring. For more than three years, Dr. Attia brought in prominent business leaders who, in turn, supported the Defendants' growth and expansion, through their own reputations and abilities to raise capital and to promote the Oura Ring. Dr. Attia helped Defendants distinguish the Oura Ring from top market competitors with respect to features and consumer experience, direct the Oura Ring's product development, and provided insight with respect to various relevant scientific studies.

56.     On social and digital media, Dr. Attia widely promoted the ring and the company to hundreds of thousands of people.

57.     Consumers purchased the Oura Rings as a direct result of Dr. Attia's promotions. Dr. Attia publicized to his subscriber base to purchase an Oura Ring at a discounted price using a promotional code.  Oura disclosed to Dr. Attia and his employees that Oura sold over 1,000 rings to purchasers using the discount codes it provided to Dr. Attia.

58.     On at least three separate occasions, (i) June 19, 2019, (ii) on December 11, 2019, and (iii) on December 9, 2020, Dr. Attia featured the Oura Ring for purchase at a discounted rate in an e-newsletter he publishes, which was sent to hundreds of thousands of subscribers, including Oura Board member David Shuman.  Oura board member David Shuman, like other recipients,

One Montgomery Street, Suite 3000, San Francisco, California 94104-5500
415.391.4800 · Fax 415.989.1663
COBLENTZ PATCH DUFFY & BASS LLP

1  received and opened these e-newsletters.  The newsletter makes clear Dr. Attia is an advisor to

2  Oura.

3        59.     Additionally, the release of each e-newsletter was heavily vetted and coordinated

4  between the Oura brand and marketing teams, and Dr. Attia's digital team.

5        60.     At all times, a full list of Dr. Attia's current business relationships with various

6  companies, including Oura, were made publicly available on his website: www.peterattiamd.com

7  on the "About" page under the "Disclosures" section.

8        61.     Dr. Attia also routinely restated his involvement with Oura in social media postings

9  that were relevant to sleep tracking data.

10        62.     It was common practice for Oura to engage in any social and digital posts in which

11  Dr. Attia mentioned Oura.  For example, Dr. Attia made an Instagram post on or around February

12  25, 2022, showing a common disclosure: "I'm an investor in and advisor to the Oura."  Oura

13  interacted with this social media post.

14        63.     At no time did any person from Oura, including Mr. Rai or David Schuman, tell Dr.

15  Attia that he was not an advisor to Oura or otherwise correct any representation Dr. Attia made

16  despite ample opportunity to do so.  Instead, Defendants decided to encourage Dr Attia to make

17  such representations, promoted such representations online, and financially benefitted from such

18  representations.

19        64.     Throughout the relevant time period, Dr. Attia also provided Defendants with

20  scientific and technical expertise.  He shared clinical insights with Oura product developers, data

21  scientists, product designers, software engineers, and use experience specialists. Dr. Attia made

22  recommendations for new feature design, proposed feature improvements, and design

23  modifications. He provided beta testing feedback, and otherwise assisted research and

24  development of successive releases of upgraded versions of the Oura Ring. Dr. Attia provided

25  input into sales and pricing strategies. He provided clinical advocacy and assisted with clinical and

26  academic studies. Dr. Attia provided numerous direct introductions to support business

27  development and investor relations. Dr. Attia assisted with business planning and strategy.

28        65.     Based on his contract with Oura, Dr. Attia declined opportunities to serve as a

COBLENTZ PATCH DUFFY & BASS LLP
ONE MONTGOMERY STREET, SUITE 3000, SAN FRANCISCO, CALIFORNIA 94104-5500
415.391.4800 · FAX 415.989.1663

1   medical advisor to Oura's competitors.

2       66.    In early 2021, Dr. Attia considered exercising his stock options early and discussed

3   this with Mr. Rai, who responded via email on March 4, 2021. In the email, Mr. Rai, on behalf of

4   Defendants, represented and confirmed the advisory agreement for 20,000 options was then worth

5   1.3 million USD. Specifically, the email provides:

**From:**       Harpreet <harpreet@ouraring.com>
**Sent:**       Thursday, March 4, 2021 11:34 PM
**To:**       Peter Attia
**Subject:**       following up

Hey Peter,
We can cash the options for advisory services.

For advisory services, I think we can focus on 2 areas.
1 - Content creation (ie the lessons or content modules along with the point's you'd want to make). We'd take into account that you don't want to be the face of the content, but more knowing that this is educational and more overall health specific, not Oura specific, where you could serve as "editor" . We'd look for you to serve as "editor" for certain episodes or topics and help you intro the episode with narrated 30 seconds etc vs the whole "episode", as we know camera time or images isn't what we would want. We'd look to make this more Netflix explained style (not just a video of any person on a screen) but more educational.
2 - You and Matt and I work together on creating peer reviewed studies etc to prove certain use cases of Oura.

Re cashing out shares, our Series C preferred price is $99.63 per share. On the tender, the new investors and the board set the price for share sales as the following (you can see the tender on the platform)
- 35% discount for common shares or options which is roughly $65 a share
- 20% discount for seed preferred shares which is roughly $80 a share
- 10% discount for series A or $90 a share

You own 15,000 Series A preferred shares. Our advisory agreement is for 20,000 options (I recall the rationale here being I gave you more than even your A shares you bought since I recognize the value you can bring). Re cashing out, I wouldn't ask for the exercise price and we'd just pay you direct deposit 1099 income. The 20,000 options are worth 1.3mm USD. I also thought about this from a tax perspective, given the preferred shares are long term cap gains, you are better off owning those for as long as possible as the share price keeps rising. VS the options will always be ordinary income better to sell those for tax reasons so the higher the price that goes the more dollars will flow to taxes.

Re payment, It would be helpful from a company burn perspective if we paid you this over 2 years (just to smooth out the cash burn from a financial modeling perspective.). We'd start with 325k cash upfront then monthly payments for the next 325k over the next 9 months of 2021). Then the 650k over 12 monthly payments next year in 2022.

You know I value you, your insight and time and advisorship. Would be fun to do this together and also with Matt. BTW - we should have that awesome updated sleep staging algo published In late May both in Sensors Publication then also our blog. Apnea data collection kicking off in May with 1k nights. Alot more validation on the come and eventually showing our HR workout curves as well on the new ring. Let's crush this and take this public.

Happy to chat this weekend

Harpreet Rai
CEO

26       67.    After the early 2021 communication referenced above, Dr. Attia continued to serve

27   as an advisor.  Mr. Rai, on behalf of Oura continued to reach out to Dr. Attia to seek his services,

28   and Oura continued to receive value from his efforts.

Case No.

COBLENTZ PATCH DUFFY & BASS LLP
ONE MONTGOMERY STREET, SUITE 3000, SAN FRANCISCO, CALIFORNIA 94104-5500
415.391.4800 · FAX 415.989.1663

**Oura Breaches the Agreement**

68.     In or about December 2021, Mr. Rai left his position with Defendants.

69.     In January 2022, Dr. Attia's options fully vested. Shortly thereafter, Dr. Attia sought to exercise the options, which he understood expired at the end of 2023.

70.     For example, on January 28, 2022, he followed-up with David Shuman, who is the Chairman of the Board of Oura and asked Oura to honor its end of the bargain.

71.     Dr. Attia found Mr. Shuman and Oura unresponsive to his requests.

72.     After Dr. Attia followed up on the matter for several months, Oura's general counsel advised the matter would require board action.

73.     Puzzled, Dr. Attia retained counsel, who sought to determine why board action would be needed. On May 24, 2022, Dr. Attia's counsel sent a formal demand to Oura's general counsel. No response was initially provided, other than the promise of a response following a board meeting scheduled for June 7, 2022.

74.     After several more weeks of follow-up, Oura's general counsel advised Oura would not honor the options contract, but proposed it would provide unspecified lesser monetary compensation for past efforts if Dr. Attia would agree to continue to serve as an advisor. In other words, by its actions, Oura confirmed it wished to continue working with Dr. Attia, acknowledged he had worked for them in the past as an advisor, and acknowledged an obligation to compensate Dr. Attia – it just wanted to pay less than the agreed upon compensation.

## CAUSES OF ACTION

### I.     Breach of Contract / Specific Performance.

75.     Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

76.     Plaintiff is entitled to recover for a breach of contract. The communications between the parties amounted to a meeting of the minds and the formation of an option contract with the terms specified above. Defendant has materially breached the option contract by failing to permit the exercise of the options.

77.     Plaintiff is entitled to specific performance of the above-described option contract. Plaintiff stands ready to pay the option price.

Coblentz Patch Duffy & Bass LLP
One Montgomery Street, Suite 3000, San Francisco, California 94104-5500
415.391.4800 · Fax 415.989.1663

78.     Alternatively, Plaintiff has suffered damages in the amount of the difference between the exercise price and the value of the stock.

79.     All conditions precedent to this suit have been performed by Plaintiff.

**II.     Quantum Meruit**.

80.     Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

81.     Defendants requested that Plaintiff provide services to them.

82.     Plaintiff provided valuable services to Defendants and for Defendants. The Defendants accepted these services for their own use and enjoyment.

83.     Defendants have not paid Plaintiff for the services.

84.     The Defendants had reasonable notice that the Plaintiff expected to be paid by Defendants for the provision of these services.

85.     Plaintiff is thus owed damages.

**III.    Promissory Estoppel**.

86.     Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

87.     Pleading further in the alternative, if there was no valid and enforceable contract or the contract is for some reason found to be unenforceable, then the agreements should be enforced under the doctrine of promissory estoppel.

88.     Defendants (through their CEO) clearly and unambiguously promised to provide Plaintiff stock options if Plaintiff would serve as an advisor to assist in the product's development and marketing.

89.     It was foreseeable that Plaintiff would rely on Defendants' promise, and the Plaintiff did in fact reasonably and justifiably rely on Defendants' promise by investing his personal time and energy into advancing the product.  Moreover, Plaintiff relied on Defendants' promise by foregoing other investment and consulting opportunities with other companies.

90.     Plaintiff specifically relied upon the representations of Defendants that his service as a medical advisor entitled him to the above-described stock options to his detriment. As such, Plaintiff is entitled to enforce the option contract. Alternatively, Plaintiff is entitled to damages.

COBLENTZ PATCH DUFFY & BASS LLP
ONE MONTGOMERY STREET, SUITE 3000, SAN FRANCISCO, CALIFORNIA 94104-5500
415.391.4800 · FAX 415.989.1663

IV.     **Negligent Misrepresentation**.

91.     Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

92.     Pleading further in the alternative, if there was no valid and enforceable contract or the contract is for some reason found to be unenforceable, then Defendants are liable for negligent misrepresentations made by their CEO to Plaintiff.

93.     Defendants' CEO represented that Plaintiff would be compensated for his work.

94.     At the time these statements were made, they were false.

95.     Defendants' CEO had no reasonable grounds for believing the representations were true at the time they were made.

96.     At the time the CEO made his misrepresentations, he was acting on behalf of Defendants.

97.     Defendants intended for Plaintiff to rely their misrepresentations.

98.     Plaintiff reasonably relied upon the misrepresentations detailed above to provide valuable services, such that Plaintiff has suffered actual damages.

## **PRAYER**

For these reasons, Plaintiff asks that Defendants be cited to appear and answer and that the Court award Plaintiff judgment against Defendants for the following:

(a)     Specific performance of the option contract and such injunctive relief as may be necessary to cause such to occur;

(b)     Actual damages within the jurisdictional limits of the Court;

(c)     Restitution for the value of the services Plaintiff provided to Defendants;

(d)     Attorneys' fees and expenses;

(e)     Prejudgment interest in the highest amount allowed by law;

(f)     Post-judgment interest in the highest amount allowed by law;

(g)     Costs of suit; and

(h)     All such further and other relief, in law and equity, to which Plaintiff may be justly entitled.

COBLENTZ PATCH DUFFY & BASS LLP
ONE MONTGOMERY STREET, SUITE 3000, SAN FRANCISCO, CALIFORNIA 94104-5500
415.391.4800 · FAX 415.989.1663

1

## DEMAND FOR JURY TRIAL

2

Plaintiff demands a trial by jury on all issues so triable.

3

DATED:  July 10, 2023                COBLENTZ PATCH DUFFY & BASS LLP

4

5

By:    */s/ Richard R. Patch*

6

RICHARD R. PATCH
7
Attorneys for Plaintiff
Dr. Peter Attia

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COMPLAINT**