UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PETER ATTIA,<br><br>      Plaintiff,<br><br>  v.<br><br>OURA RING, INC., et al.,<br><br>      Defendants. | Case No. 23-cv-03433-HSG<br><br>**ORDER DENYING DEFENDANTS' MOTION TO COMPEL ARBITRATION AND TO DISMISS OR, IN THE ALTERNATIVE, STAY PROCEEDINGS**<br><br>Re: Dkt. No. 16 |

Pending before the Court is a motion to compel arbitration filed by Defendants Ouraring, Inc. and Oura Health Ltd. Dkt. No. 16. The Court finds this matter appropriate for disposition without oral argument and the matter is deemed submitted. *See* Civil L.R. 7-1(b). For the reasons discussed below, the Court **DENIES** Defendants' motion to compel arbitration.

**I.   BACKGROUND**

On July 10, 2023, Plaintiff Peter Attia filed a complaint against Ouraring. Inc. ("Oura") and Oura Health Oy ("Oura Oy") (collectively, "Defendants") based on Defendants' alleged failure to compensate him for advisory work he performed for the companies.[1] *See* Dkt. No. 1 ("Compl."). Plaintiff is a "renowned" physician who focuses on "the applied science of longevity" and has expertise in "nutritional interventions, exercise physiology, sleep physiology, emotional and mental health, and pharmacology to increase lifespan, while simultaneously cultivating and improving a healthy quality of life." Compl. ¶ 11. Oura and Oura Oy are affiliated Finnish companies (with Oura Oy acting as Oura's parent company) that developed the Oura Ring, which is "a piece of wearable technology that uses sensors to track health metrics,"

---

[1] There is some inconsistency in the spelling of Defendants' company names. The Court uses the naming conventions in Plaintiff's complaint.

including sleep metrics. *Id.* ¶ 15. Plaintiff first met with Harpreet Singh Rai ("Rai") – who began serving around that time as president of the two companies – in December 2016 for a discussion about Plaintiff's possible involvement with the Oura Ring product. *Id.* ¶ 21. Plaintiff alleges that following that conversation, he began serving as medical advisor to Defendants, and provided a host of useful services, such as beta testing the Oura Ring (*id.* ¶¶ 31–32), promoting the Oura Ring in the scientific community and on social media (*id.* ¶¶ 54–58), recommending new product features and modifications (*id.* ¶ 64), connecting Defendants with business leaders (*id.* ¶ 54), and suggesting doctors who could perform validation studies of the product (*id.* ¶ 34).

Plaintiff alleges that he provided these and other services throughout 2017 and 2018 without any written agreement formalizing the arrangement, though he repeatedly requested that one be drafted. Compl. ¶¶ 35, 37, 44. Defendants supposedly "delayed circulating a written document memorializing the agreement, but reiterated their promises to do so and to fairly compensate [Plaintiff]" for his advisory services." *Id.* ¶ 37. In October 2018, after Plaintiff again raised the issue of a written agreement, Rai emailed him with an update that he "received approval from the board to issue [Plaintiff] [advisory] options equal to [Plaintiff's] previous total investments." *Id.* ¶ 46. That year, in April and October 2018, Plaintiff had made investments in Oura Oy, facilitated in each instance by an Investment Agreement and an Adherence and Amendment Agreement, which bound Plaintiff to the terms of the Oura Health Shareholders Agreement containing, among other things, an arbitration clause. Dkt. No. 28-5, Declaration of Dr. Peter Attia ("Attia Decl.") ¶¶ 19–25. In the October 18 email, Rai explained that the package approved for Plaintiff was more generous than some others because Plaintiff "ha[d] been so helpful" and Defendants "need[ed] [his] expertise more than ever." *Id.* Based on Rai's representations, Plaintiff alleges that he continued to work, "believing that Oura and he had reached a separate agreement that he would be compensated via advisory options to purchase discounted stock in Oura." Compl. ¶ 47.

On January 24, 2019, Rai emailed Plaintiff a copy of Oura Health Oy/Oura Ring Inc.'s Adviser Equity Plan 2018 US Stock Option Agreement ("Advisor Agreement"), which provided that he would be "awarded stock options for 20,000 shares at an exercise price of EUR 1.76 per

2

share in conjunction with his provision of services in a 'Medical Advisory role for Oura Ring.'" *Id*. ¶ 49. Plaintiff signed and returned the agreement, and continued serving in his medical advisory role. Nearly two years later, Plaintiff reached out to Rai to explore exercising his stock options early (though he did not ultimately do so). *Id*. ¶ 66. In his March 4, 2021 reply, Rai stated the "advisory agreement [was] for 20,000 options," which he estimated to be worth "1.3 million USD." *Id*. In January 2022, after Rai's departure from the companies, Plaintiff contacted the Chairman of the Board of Oura in order to exercise his options, which by that point had fully vested. After many months of unresponsiveness, Oura's general counsel allegedly advised Plaintiff that "Oura would not honor the options contract, but proposed it would provide unspecified lesser monetary compensation for past efforts if Dr. Attia would agree to continue to serve as an advisor." *Id*. ¶ 74.

Based on these events, and to recover the amount allegedly due to him for his advisory services, Plaintiff sued for breach of contract, quantum meruit, promissory estoppel, and negligent misrepresentation. *Id*. ¶¶ 75–98. Defendants, on September 18, 2023, filed a motion to compel the case to arbitration. Dkt. No. 16 ("Mot."). They mainly argue that because Plaintiff agreed to arbitrate the transfer of options when he invested as a shareholder, the present dispute must be arbitrated because the form of compensation alleged to be owed to him for his medical advisory services is also options. The matter is now fully briefed. Dkt. Nos. 28 ("Opp."), 29 ("Reply").

## II.    LEGAL STANDARD

Written agreements to settle commercial disputes by arbitration are subject to the Federal Arbitration Act ("FAA"). The FAA, 9 U.S.C. § 1 et seq., establishes that a written arbitration agreement is "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2; *see also Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983) (noting federal policy favoring arbitration). The FAA allows that a party "aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court . . . for an order directing that . . . arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4.

1    In determining whether to compel arbitration, the court must consider the two "gateway"
2    questions of arbitrability, namely whether a valid arbitration agreement exists between the parties,
3    and whether the agreement covers a particular controversy. *Henry Schein, Inc. v. Archer & White*
4    *Sales, Inc.*, 139 S. Ct. 524, 529 (2019). However, even these "gateway" questions can be
5    delegated to an arbitrator where there is "clear and unmistakable" evidence that the parties
6    contracted for that. *See Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015). Because an
7    "agreement to arbitrate a gateway issue is simply an additional, antecedent agreement the party
8    seeking arbitration asks the federal court to enforce," a court may not decide gateway issues if
9    they have been clearly delegated. *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 69 (2010).

10   That notwithstanding, and even when there is a valid delegation clause, "the court
11   determines whether a valid arbitration agreement exists" before referring the matter to an
12   arbitrator. *Henry Schein, Inc.*, 139 S. Ct. at 530; *see also Caremark, LLC v. Chickasaw Nation*, 43
13   F.4th 1021 (9th Cir. 2022) ("[T]he the Supreme Court clarified that contract-*formation* issues are
14   always matters for judicial resolution" and "explained that the issues reserved to the courts for
15   decision always include whether an arbitration agreement was formed, even in the presence of a
16   delegation clause." (internal citations omitted) (emphasis in original)). The party seeking to
17   compel arbitration bears the burden of proving by a preponderance of the evidence that there was
18   such an agreement. *Norcia v. Samsung Telecomms. Am., LLC*, 845 F.3d 1279, 1283 (9th Cir.
19   2017). Where the existence of an arbitration agreement encompassing the claim at bar is at issue,
20   the court applies "general state-law principles of contract interpretation," without a presumption in
21   favor of arbitrability. *Goldman, Sachs & Co. v. City of Reno*, 747 F.3d 733, 742 (9th Cir. 2014)
22   (internal quotation omitted).

23   **III.   DISCUSSION**

24   Defendants contend that when Plaintiff signed the Adherence Agreement, which
25   incorporated the Shareholders Agreement, he agreed to arbitrate this dispute with Oura Oy and to
26   commit the threshold questions of arbitrability to an arbitrator with a clear and unmistakable
27   delegation clause. *See generally* Mot. They further argue that even if Plaintiff did enter into an
28   agreement covering his advisory relationship (which they dispute), that agreement likewise leads

4

to arbitration. *Id.* Plaintiff disagrees, arguing that Defendants' analysis improperly frames the arbitration agreement contained in the Shareholders Agreement as operative, but that in fact the parties never formed an agreement to arbitrate claims encompassing Plaintiff's current dispute in *either* agreement. *See* Opp. The Court agrees with Plaintiff that his agreement to invest and his agreement to advise were "separate and not interrelated," and that Plaintiff and Oura Oy never formed an agreement to arbitrate the claims at issue in this lawsuit. *Johnson v. Walmart Inc.*, 57 F.4th 677, 683 (9th Cir. 2023).

### A. The Adherence Agreement and Shareholders Agreement

In their motion, Defendants presuppose that the Shareholders Agreement – "the contract in which the arbitration provision appeared" – is "the 'relevant contract between the parties' and generally governed the subject matter of the parties' dispute." *Perez v. Discovery Bank*, 74 F.4th 1003, 1010 (citing and quoting *Smorowski v. Domino's Pizza LLC*, CV 20-10739-MWF, 2021 WL 4440167, at *4 (C.D. Cal. July 23, 2021)). But Plaintiff is correct that recent Ninth Circuit authority confirms that "where the parties have entered into multiple contracts, it is not sufficient for a party moving to compel arbitration to merely point to an arbitration agreement between the parties relating to one of those transactions," and must instead "demonstrate that the parties formed an agreement to arbitrate *the particular claims at issue*." Opp. at 11 (discussing *Perez v. Discovery Bank* and *Johnson v. Walmart Inc.*). While Defendants argue that the Adherence and Shareholders Agreements govern the claims at issue, the Court finds "that the existence of an arbitration agreement [governing the subject matter of the parties' dispute]" is contested, meaning that "the presumption in favor of arbitrability does not apply." *Johnson*, 57 F.4th at 681.

To answer whether Plaintiff and Oura Oy formed an agreement to arbitrate the claims at issue here when they entered into the Adherence Agreement, which in turn incorporated the Shareholders Agreement ("SHA"), '[the Court] use[s] general state-law principles of contract interpretation." *Johnson*, 57 F.4th at 681 (quoting *Goldman, Sachs & Co*, 747 F.3d at 743). In California, "a contract must be so interpreted as to give effect to the mutual intention of the parties at is existed at the time of contracting." *Perez*, 74 F.4th at 1010 (quoting *Revtich v. DIRECTTV, LLC*, 977 F.3d 713, 717 (9th Cir. 2020)). In discerning that mutual intent, a court must give the

5

"words of a contract [] their usual and ordinary meeting" and must "interpret the meaning of the individual arbitration clauses 'in connection with the rest of the agreement' and 'not detached portions thereof.'" *Johnson*, 57 F.4th at 682 (quoting *Int'l Bhd. Of Teamsters v. NASA Servs., Inc.*, 957 F.3d 1038, 1042 (9th Cir. 2020)).

The arbitration clause contained in the SHA to which Plaintiff consented to be bound when he bought shares of Oura Oy and executed the Adherence Agreements in April and October 2018 states that:

> Any dispute, controversy or claim arising out of or in connection with this Agreement or the transactions contemplated herein, or the breach, termination or validity thereof shall be finally and exclusively settled by arbitration in accordance with the Arbitration Rules of the Finland Chamber of Commerce.

Dkt. No. 16-1, Declaration of Avonte Campinha-Bacote ("Campinha-Bacote Decl."), Exhibit B (SHA § 13.12).

Defendants point out that the stated "purpose" of the SHA is "to agree, among other things, on matters relating to the administration of the Company and the Shareholders' rights and obligations as shareholders of the Company, including *terms and conditions relating to the transfer of Equity Securities*." Dkt. No. 16-1, Exhibit B ("SHA") at 46 (Recital D) (emphasis added). They further stress that the SHA defines "Equity Securities" as "the Shares and any securities directly or indirectly convertible into or exchangeable for Shares, *as well as an option* or any other right to subscribe for, purchase or otherwise acquire Shares." *Id*. at 49 (§ 1.25, definition of "Equity Securities") (emphasis added). Putting the pieces together, Defendants contend that because the Advisor Agreement contemplates compensation with options and because the SHA governs the transfer of options, the arbitration clause contained in the SHA controls this case. Mot. at 13–15.

Considering the SHA holistically, as it must, the Court is not persuaded that an agreement governing Plaintiff's shareholder relationship also governs his advisory one. The plain language of the SHA specifies that it delineates "Shareholders' rights and obligations *as shareholders* of the Company." SHA, Recital D (emphasis added). In other words, it does not purport to govern all aspects of signatories' relationship with Defendants. The Court finds this scenario analogous to

6

1  the one described in *Johnson v. Walmart Inc.*, which also dealt with two different transactions
2  between the same two parties. There, the court determined that an arbitration clause contained in
3  the Terms of Use that Johnson agreed to when making an online purchase governed his
4  relationship with "Walmart Sites," but could not be read to govern his in-store engagement with
5  Walmart. *Johnson*, 57 F.4th at 682. Since the plaintiff's dispute arose out of an in-store (not an
6  online) purchase, the Court concluded that "the language and subject matter of the contract make
7  clear that by agreeing to the Terms of Use, Johnson did not assent to arbitrate claims that might
8  arise out of a separate, in-store purchase." *Id*. The situation here is comparable: Plaintiff agreed
9  to arbitrate claims arising from his relationship as a shareholder, but not those arising in other
10 contexts.

11 Even if it were otherwise, the provisions of the SHA that govern the transfer of equity
12 securities (including options) almost exclusively impose rights and restrictions on *shareholders'*
13 transfer of those investments. *See* SHA § 5 (Transfer of Equity Securities). The SHA "is largely
14 silent as to the terms of conditions placed on Oura [Oy] regarding the issuance or transfers of
15 equities," and where "issuance" is discussed, it is only "to describe *shareholders'* rights arising
16 from such issuances." Opp. at 17 (citing SHA § 2.1) (emphasis in original). That "any and all
17 (i.e., 100%) of the issuance of any and all options [is] governed by the [SHA]," Reply at 7, does
18 not change the fact that the plain language of the agreement governs what shareholders can and
19 cannot do with their equity securities (including options) after purchase, and does not provide any
20 guidance about when and under what circumstances *Defendants* issue options as compensation for
21 advisory services. Based on this, the Court cannot conclude that Plaintiff and Oura Oy's mutual
22 intent upon executing the SHA was for that agreement to govern the future issuance (or non-
23 issuance) of options to Plaintiff for advisory services.

24 Ultimately, the Court views the agreements governing Plaintiff's decision to invest and his
25 decision to advise as independent. The indisputable gravamen of the current suit is Defendants'
26 alleged failure to compensate Plaintiff for the advisory services he provided. Though Defendants
27 try to paint this as a suit about options and argue that Plaintiffs' references to consulting are
28 somehow a "red herring," it is Defendants who err in asserting the centrality of the *form* of

7

1   compensation. Analytically, the form of compensation is incidental: Defendants could have
2   promised to pay Plaintiff in cash or real estate or baseball cards, and his central complaint would
3   be the same. The point is that the agreements bear on fundamentally unrelated subject matters,
4   were negotiated separately, and involve different consideration. The fact that they happen to both
5   say the word "options" and involve the same parties is insufficient to make these independent
6   agreements interrelated.
7         Therefore, the Court disagrees with Defendants that "it would be absurd *not* to find that
8   [Plaintiff] and Oura Health Oy agreed to arbitrate" Plaintiff's claims related to the advisor
9   agreement, Reply at 11, and concludes the record clearly establishes that the parties formed no
10  such agreement when they executed the Adherence Agreements incorporating the SHA.

      **B.    The Advisor Agreement**

12        The Court must next consider whether Plaintiff and Oura Oy formed an agreement to
13  arbitrate the claims involved in this case when they allegedly agreed that Plaintiff would provide
14  paid advisory services. The Court concludes that they did not.
15        As a preliminary matter, the Court acknowledges that the parties do not see eye to eye
16  about whether they ever even formed a contract to pay Plaintiff for his advisory services. Plaintiff
17  alleges they "reached an agreement that was memorialized in their various written
18  communications (including the Advisor Agreement)," Opp. at 20 n.7, while Defendants
19  "vehemently dispute" that a contract was formed, since the Advisor Agreement was "never
20  authorized or approved by Oura Health Oy's (or Ouraring Inc.'s) Board of Directors, and was
21  never executed by anyone at either company," Mot. at 15. Getting to the bottom of that question
22  is a task for another day: at this stage in the litigation, Defendants concede – as they must – that
23  the allegations must be construed in the light most favorable to the nonmoving party, and argue
24  that even if the Advisor Agreement *did* bind the parties, it also provides for arbitration. *Id*.
25        Defendants rest their argument on the fact that the Advisor Agreement purportedly states
26  that "the Options and Shares issued to [Plaintiff] pursuant to an exercise hereof are subject to . . .,
27  and [sic] the terms and provisions (including rights of first refusal) of that certain shareholders
28  agreement dated 17 April 2015 by and among various shareholders of the Company, including the

8

Share transfer restrictions and co-sale obligations set for in Section 9 thereof." Mot. at 15. Defendants argue that because the Advisor Agreement subjects Plaintiff to the terms and provisions the SHA, Plaintiff is bound by the arbitration clause contained within it. To do so, Defendants (improperly) omit a key part of the quoted text, which actually states that Plaintiff agrees that "the Options and Shares issued to [him] . . . are subject to *restrictions on transfer* as contained in . . . the terms and provisions" of the "17 April 2015" shareholders agreement. *See* Campinha-Bacote Decl., Ex. E (emphasis added). Defendants presumably chose to omit the italicized language because its inclusion unquestionably cabins the Advisor Agreement's incorporation of the SHA to the terms and provisions relating to restrictions on the transfer of options and shares. But even this narrower incorporation is suspect: Plaintiff is correct that because the Advisor Agreement references "that certain shareholders agreement dated 17 April 2015," and because – as Defendants concede, *see* Campinha-Bacote Decl. ¶ 15 – no such document exists, Defendants' effort to incorporate the operative September 2016 SHA (whether in part or in whole) is ineffective since the reference to it is not "clear and unequivocal." *Perez v. DirecTV Grp. Holdings, LLC*, 251 F. Supp. 3d, 1328, 1338 (C.D. Cal. 2017), *aff'd sub nom. Perez v. DirecTV, LLC*, 740 F. App'x 560 (9th Cir. 2018) (internal quotations omitted). The Court therefore has no trouble finding that to the extent the Advisor Agreement incorporated *any* provisions of the SHA, it did not incorporate any SHA provisions unrelated to "restrictions on transfer," such as the arbitration clause.

Accordingly, the Court concludes that Plaintiff and Oura Oy did not form an agreement to arbitrate this dispute when they allegedly agreed for Plaintiff to provide paid advisory services.[2]

\* \* \* \* \*

---

[2] For purpose of this analysis, the Court assumes for sake of argument but does not hold that the Advisor Agreement is the relevant contractual instrument. However, its conclusion would be no different if the Court found, arguendo, that the Advisor Agreement *plus* the relevant email communications between Plaintiff and Rai constituted the contract. Excepting the Advisor Agreement, those email communications do not themselves contain any reference to arbitration clauses, nor do they incorporate any document containing an arbitration clause. In other words, so long as the Court assumes, as it must, that the parties reached an agreement for services (whether via the Advisor Agreement or via emails *and* the Advisor Agreement), it finds that the parties never formed an agreement to arbitrate Plaintiff's claims.

Since the Court finds that Plaintiff did not "form an agreement to arbitrate [the advisor agreement claims,] . . . [the SHA and the Advisor Agreement] [do] not require [Plaintiff] to arbitrate [his advisory agreement] claims." *Perez*, 74 F.4th at 1011; *see also AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986) (since "arbitration is a matter of contract[,] . . . a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." (internal quotation marks and citations omitted)). Defendants' motion to compel arbitration is **DENIED.**[3]

## IV. CONCLUSION

The Court **DENIES** Defendants' motion to compel arbitration. Dkt. No. 16.

The Court further **SETS** a telephonic case management conference on April 16, 2024, at 2:00 p.m. and **DIRCTS** the parties to submit a joint case management statement by April 9, 2024. All counsel shall use the following dial-in information to access the call:

Dial-In:  888-808-6929

Passcode:  6064255

All attorneys and pro se litigants appearing for a telephonic case management conference are required to dial in at least 15 minutes before the hearing to check in with the courtroom deputy. For call clarity, parties shall NOT use speaker phone or earpieces for these calls, and where at all possible, parties shall use landlines.

**IT IS SO ORDERED.**

Dated:   4/1/2024

_____
HAYWOOD S. GILLIAM, JR.
United States District Judge

---

[3] Given that the Court found that Plaintiff and Oura Oy never reached an agreement to arbitrate the claims at issue in this case, it need not address the parties' arguments as to whether the delegation clause in the SHA is "clear and unmistakable," whether the "gateway" issues under the FAA have been satisfied, or whether Oura can be compelled to arbitration as a non-party to the shareholders agreements.

10